IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARLENE MELTON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES SOCIAL SECURITY | : | |
| ADMINISTRATION | : | NO.  10-7217 |

### MEMORANDUM

**Padova, J.**                                                              **September 5, 2012**

Defendant the United States Social Security Administration (the "SSA") has filed a Motion

for Summary Judgment in this action in which Plaintiff Darlene Melton, an SSA employee, asserts

Title VII claims for retaliation, including a retaliation claim predicated on a hostile work

environment.  For the following reasons, we grant the Motion and enter judgment in the SSA's favor.

### I.     BACKGROUND

####     A.     Factual Background

The record facts are as follows.  Plaintiff Darlene Melton joined the SSA in 1978.  (Def.'s

Stmt of Undisputed Material Facts ("Def. Stmt"), at ¶ 1.)[1]  She is currently a Disability Processing

Specialist in the SSA's regional office on Spring Garden Street in Philadelphia, a position she has

held since February 2009.  (Id. ¶ 2.)  From 1992 until her transfer to her current position, with the

exception of a one-year period from July 2006 to July 2007, Melton was a Claims Representative

in the SSA's Northeast Philadelphia District Office.  (Id. ¶¶ 3, 9.)  During the one-year period,

Melton was in a special SSA program, called PREDP, that permits employees to rotate through

---

[1]Melton filed two responses to Defendant's Statement of Undisputed Material Facts.  She
first filed "Plaintiff's Objection to Defendants' Statement of Uncontested Facts" and then, almost
four months later, she filed a "Supplemental Statement" ("Pl. Suppl. Stmt"), which altered many of
her prior responses.  In order to consider the record evidence in the light most favorable to Melton,
we cite only to those paragraphs of Defendant's Statement of Undisputed Material Facts that are
undisputed in both of Melton's responsive filings.

different SSA offices and positions.  (Id. ¶ 7.)  Melton's first line supervisor during the bulk of her

time as a Claims Representative at the Northeast office was Susan Tonik.  (Id. ¶ 10.) Robert

Mannion was the District Manager of the Northeast District Office from 1988 until 2009, during

which time he was Melton's second or third line supervisor.  (Id. ¶ 12.)

Melton was advised on June 25, 2007, that she would be a witness at an Equal Employment

Opportunity ("EEO") hearing to address claims brought by a former SSA employee named Reuben

Hoggard.  (Id. ¶ 17.)  The hearing was originally scheduled for July 19, 2007, but was postponed

because the judge was ill.  (Id. ¶ 15.) Eventually, the hearing took place on September 25, 2007, and

the judge issued a bench decision on September 28, 2007, dismissing Hoggard's claims.  (Id. ¶ 16).

Less than one week later, on October 4, 2007, Melton experienced breathing problems at

work and left the office to seek medical attention.  (Melton Dep. at 171-72, attached as Ex. 1 to Pl's

Opp. to Summ. Judg. Mot.)  Based on medical documentation that Melton initially submitted,

Melton's sick leave was approved until October 29, 2007.  (See Ex. 25 to Def.'s Summ. Judg. Mot.)

After that, however, the SSA required that she submit additional up-to-date medical documentation

in order to extend her leave until November 19, 2007.[2]  (Id.) Tonik specifically advised Melton that

---

[2]SSA policies require that employees submit certain paperwork and documentation when they seek sick leave for an absence longer than three days. (Decl. of Joseph Carroll ("Carroll Decl.") at ¶ 4, attached as Ex. 21 to Def.'s Summ. Judg. Mot.)  Specifically, the employee must submit a written leave request, setting forth, *inter alia*, the beginning and end dates of the requested leave, and the type of leave requested.  (Id.)  The employee must also submit administratively acceptable documentation from a physician.  (Id.)  Among other requirements, the documentation from the physician must set forth a narrative description of the employee's medical diagnosis, the current prognosis, and the estimated time until the employee can return to work.  (Id.)  According to SSA policy, if the procedures for approval of extended leave are not followed, the SSA may deny the employee leave, or may record the absence as "undetermined."  (Id. ¶ 5.)  In either of these two circumstances, the employee is officially charged with Absence Without Leave ("AWOL").  (Id.)

her leave would be recorded as AWOL, that is, Absent Without Leave, if proper documentation was not submitted.  (Melton Decl. ¶ 33, attached as Ex. 11 to Pl.'s Opp to Summ. Judg. Mot.; Ex. 26 to Def.'s Summ. Judg. Mot.)   Ultimately, Melton submitted additional documentation from her physician, as well as a formal extended leave request, and the SSA approved her medical leave through November 19, 2007.  (Exs. 23(m), (o) to Def.'s Summ. Judg. Mot.)  Melton returned to work on November 20, 2007.  (Melton Decl. ¶ 36)

In January 2008, an SSA assistant manager, Kathy Tannery, was looking for some documentation that an SSA client had submitted to the agency.  (Tonik Dep. at 60, 66, attached as Ex. 3 to Pl.'s Opp. to Summ. Judg. Mot.)  She looked on Melton's desk and, in the process of doing so, she rearranged some of Melton's papers.  (Id. at 61.)  Thereafter, Melton was advised to organize the piles of documents on her desk by priority rather than filing date.  (Id. at 68-69.)  Melton was very upset that Tannery had disturbed the papers on her desk.  (Id. at 61; see also Melton Dep. at 404-05.)

In February 2008, Melton attempted to "protest . . . the appointment of a representative payee for [her] father's monthly Social Security checks," apparently because a stranger was receiving her father's social security benefits.  (Melton Decl. ¶ 44.)  When she did not get the relief she desired from her local office, she sought the help of management at the Northeast office.  (Id.)  However, management at the Northeast Office refused to get involved.  (Id.)  Melton states, without any record support, that the refusal was "against agency policy since as an employee [she is] to handle family related matters through management."  (Id.)  The SSA has submitted undisputed evidence that it is, in fact, "acceptable" for employees to conduct routine business regarding personal social security benefits in the office in which they work.  (Tannery Decl. at ¶ 5, attached as Ex. 30 to Def.'s Summ.

Judg. Mot.)   However, the SSA also has policies against employees using their public office for private gain and must always guard against the appearance of impropriety or favoritism.  (McFeeley Decl. at ¶¶ 5-7, attached as Ex. 31 to Def.'s Summ. Judg. Mot.)  Given those policies, the Acting Team Leader for Labor and Employee Relations at the SSA states that it would have been inappropriate for the Northeast Office to intervene in the contested representative payee issue after Melton received an unfavorable decision from her local office.  (Id. ¶¶ 8-12.)

Two months later, on or about April 16, 2008,  Tonik approached Melton about returning late from her fifteen-minute morning break.  (Melton Decl. ¶ 37.)  The record contains conflicting evidence as to when Melton left for break and when she returned, and whether, as Tonik claimed, she could have determined the time that Melton returned based on office scanners that record certain information when employees use their access key cards.  However, the record is undisputed that the SSA has an established break policy that permits a 15-minute morning break, a 30-minute lunch break, and a 15-minute afternoon break.  (Id. ¶ 38.)  The record is also undisputed that this was the first and only time that Tonik ever confronted Melton about lateness, and that Melton was neither disciplined nor docked any pay as a result of this incident, and that no file memo was ever written about the incident.  (Def. Stmt ¶¶ 124-25; Tonik Dep. at 83; Melton Dep. at 260 (admitting that "nothing negative happened to [her] at work" as a result of this incident).)

Melton received her 2008 "Final Performance Review" from Tonik on October 27, 2008.  (See Ex. 17 to Def.'s Summ. Judg. Mot.)  Melton was reviewed in four categories – Interpersonal Skills, Participation, Achieves Business Results, and Demonstrates Job Knowledge.  (See id.)  In each category, employees are rated Level 1 (Not Successful), Level 3 (Successful Contribution) or Level 5 (Outstanding Contribution).  (Def. Stmt ¶ 35.)  Tonik gave Melton Level 3 ratings in each

of the four categories.  (Id. ¶ 44.)  According to SSA policy, the Level 3 rating indicated that Melton

was "making a valuable contribution to the mission of the agency."  (Id. ¶ 38.)  There were also

numerous positive comments in Melton's October 2008 appraisal, including "You continue to

perform your job with integrity and honesty" and "You demonstrate sound analytical reasoning in

applying policy, procedures and instructions."  (Ex. 17 to Def.'s Summ. Judg. Mot.)  With respect

to Plaintiff's Interpersonal Skills, Tonik wrote the following comment:

> You treat the public with courtesy and respect and maintain a positive
> and productive relationship with your claimants.  You need to
> consistently display the same skills when dealing with your fellow
> employees and members of management, pacticularly [sic] when you
> are in a stressful situation.

(Id.)  Melton disagreed with this comment.  (See, e.g., Pl.'s Suppl. Stmt at ¶¶ 42, 47.)  At her

deposition, Tonik identified several individuals, both co-workers and members of management, who

had complained that it was difficult to communicate with Melton, that she had rambling speech

patterns that were sometimes incoherent, and that she periodically became impatient.  (Tonik Dep.

at 79-81.)  According to Tonik, her comment regarding Melton's interpersonal skills in connection

with fellow employees and managers was the result of these complaints.  (Id.)

### B.       Procedural Background

In very early November, 2008, Melton contacted her local Equal Employment Opportunity

("EEO") office.  In February 2009, she filed an EEO charge, alleging retaliation based on her

testimony at the Hoggard hearing.  (See Exs. A and B to Def.'s Mot. for Partial Summ. Judg. ("Partial

SJ Mot.").)  Specifically, Melton alleged that she had been subjected to non-sexual harassment, as

well as a retaliatory performance appraisal.  (See id.)  The SSA thereafter investigated Melton's

claims that she had been subjected to a hostile work environment and harassment in retaliation for

her testimony at the Hoggard hearing.  (Ex. G to Partial SJ Mot.)  Specifically, it investigated  four allegations of harassment and retaliation that Plaintiff had raised in her EEO charge: (1) that some of her boxed supplies were lost during an office move in 2006, (2) that she was threatened with an AWOL charge when she was out on medical leave in early 2008, (3) that she was accused of returning late from lunch in April 2008, and (4) that she was warned that she could be sent home for wearing jeans in August of 2008.[3]  (Ex. I to Partial SJ Mot.)  On March 8, 2010, after completion of its investigation, the SSA issued a final decision, finding that Melton had not been discriminated against based on reprisal.  (Id.)  Plaintiff appealed the SSA's decision to the Equal Employment Opportunity Commission ("EEOC") on April 5, 2010, and the EEOC affirmed the SSA's decision on September 14, 2010.  (See Ex. J to Partial SJ Mot.)

In her Complaint in the instant action, Melton alleged that the SSA had violated Title VII by engaging in race discrimination, gender discrimination, and retaliation.  She asserted that she had been subjected to discriminatory discipline, a discriminatory performance review, a hostile work environment, and a discriminatory failure to promote.  On April 13, 2011, the SSA filed a motion for partial summary judgment in which it sought judgment in its favor on Melton's Title VII claims insofar as they rested on allegations of race and/or gender discrimination and any failure to promote, contending that Melton had not exhausted her administrative remedies with respect to these claims. We granted the SSA's motion and granted judgment in the SSA's favor on the claims of race and gender discrimination, as well as on her claims grounded on any failure to promote, finding that Melton had, in fact, failed to exhaust her administrative remedies with respect to those claims.  See

---

[3]The SSA did not investigate the allegedly retaliatory performance appraisal, because Plaintiff had grieved that appraisal through a procedure set up in her union's collective bargaining agreement.  (See Ex. G to Partial SJ Mot.)

Melton v. United States Soc. Sec. Admin., Civ. A. No. 10-7217, 2011 WL 3652513, at *6 (E.D. Pa. Aug. 18, 2011).  As we explained, Plaintiff had not raised claims of race discrimination, gender discrimination or discriminatory failure to promote before the EEOC, and no investigation of such claims could be reasonably expected to grow out of the EEOC charge that she filed.  See id. at *5-6.

The SSA has now moved for summary judgment on Melton's remaining claims.  Upon reviewing Melton's response to that Motion, we were uncertain as to the precise claims that Melton was now pursuing.  As a result, we issued an Order, requiring Melton to file a brief statement of her claims, setting forth a single paragraph for each claim and specifying the workplace action on which each claim was based.  Melton filed that statement on July 25, 2012, and identified four Title VII claims: (1) retaliation based on the SSA's failure to promote her to a Program Analyst; (2) retaliation based on the SSA's failure to promote her to a Supervisory Contact Administrator; (3) retaliation based on her October 2008 Performance Review; and (4) retaliatory Hostile Work Environment. (See Pl.'s Stmt of Claims.)  We held argument on the SSA's summary judgment motion on August 2, 2012.[4]

## II.    LEGAL STANDARD

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In making this

---

[4]Twelve days after the hearing, Plaintiff submitted, without authorization, a multi-page "demonstrative exhibit that is intended to aid the Court's understanding of the issues and locate supporting exhibits in the record."  (8/14/12 Ltr. from Pl.'s counsel to Ct., attaching Post-Hrg Submission.)  While we consider Plaintiff's claims to be defined by her pre-hearing Statement of Claims, we have considered the new record cites in the post-hearing submission insofar as they purport to support those claims.

determination, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 276 (3d Cir. 2001) (internal quotation marks omitted). If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted. Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

"'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)). "Evidence that is merely

colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial." West v. Lincoln Benefit Life Co., 509 F.3d 160, 172 (3d Cir. 2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and El v. SE Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)).

## III.   DISCUSSION

As noted above, Melton asserts four claims against the SSA: (1) two retaliation claims based on failures to promote, (2) one retaliation claim based on her October 2008 performance review, and (3) one retaliation claim grounded on a hostile work environment.  The SSA argues that because we already entered judgment in its favor on Melton's failure to promote claims, we should not consider these claims anew in connection with the currently pending motion.  With respect to the two latter claims, the SSA essentially argues that we should enter judgment in its favor because there is no record evidence that supports the claims.

### A.   Failures to Promote

Melton claims that two specific failures to promote were retaliatory.  The first occurred on September 20, 2007, seven days before she testified at the Hoggard hearing, when she was rejected for a position as a Program Analyst in the Office of Disability and Adjudicated Review.[5]  The second

---

[5]Although this failure to promote occurred before Melton testified, Melton contends that the SSA knew of her intention to testify prior to the Hoggard hearing.  In this regard, she initially asserted that both Tonik and Mannion were aware that she would testify at the hearing as early as July 19, 2007, because they were also scheduled to testify and had received a list of temporary parking assignments for all of the witnesses on the schedule.  (See Melton Decl. at ¶¶ 6-7 (citing Ex. 4 to Pl.'s Opp. to Summ. Judg. Mot.), attached as Ex. 11 to Pl.'s Opp. to Summ. Judg. Mot.) She later attempted to move the date earlier, asserting that the Tonik and Mannion knew as early as June 25, 2007, when Melton received an email from the SSA's counsel, advising her that she would be testifying at the hearing.  (See Post-Hrg Submission at ¶ 1a (citing Ex. 7 to Def.'s Summ. Judg. Mot.)  For purposes of resolving Defendant's summary judgment motion, we will accept Melton's assertion that June 25, 2007 is the operative date of her protected conduct, at least when that date is

occurred on September 30, 2008, approximately one year after her Hoggard testimony, when she was rejected for a position as Supervisory Contact Representative in the Telecommunications Service Center.  The SSA argues that Melton cannot proceed on these claims because we entered judgment on all claims grounded on failures to promote in our August 18, 2011 Memorandum and Order, concluding that Melton had failed to exhaust her administrative remedies with respect to such claims.  See Melton, 2011 WL 3652513, at *5-6.

A brief review of our August 18, 2011 Memorandum leaves no doubt that we have already granted judgment in the SSA's favor on all claims based on failures to promote, including those that Melton now seeks to pursue.  As we explained in that Memorandum, prior to instituting a Title VII action in the district court, an employee must exhaust her administrative remedies by following procedures set forth in the Code of Federal Regulations.  Id. at *3 (citations omitted).  The parameters of the employee's Title VII action are "defined by the scope of the EEOC investigation which [could] reasonably be expected to grow out of" the charge of discrimination that the employee pursued in the administrative process.  Id. at *4 (citing Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976)).  Here, Melton's EEO charge indicated that the type of discrimination she was alleging was "retaliation," and when prompted with check boxes to indicate the matters causing her complaint, she did not check the box for "promotion," and instead checked only the boxes for "evaluation/appraisal" and "harassment (non-sexual)."  Id. at *5.  Moreover, Melton did not mention any failure to promote in a December 18, 2008 interview that was conducted in connection with her EEO charge, suggesting only that Tonik's comments on her October 2008 performance appraisal might, in the future, interfere with her "potential for promotion by the agency

_____

the most favorable to Melton's claims.

or other governmental agencies." Id.

Under these circumstances, we unambiguously concluded in our August 18, 2011 Memorandum that Plaintiff "did not raise in her EEOC charge a discrimination claim based on any failure to promote and that, as a result no investigation into a failure to promote could reasonably be expected to grow out of the EEOC charge."[6] Id. at *6. We therefore entered judgment in the SSA's favor on any claims grounded in a failure to promote. Id.

With this prior holding, we extinguished all failure to promote claims, including those that Melton now seeks to pursue. Accordingly, we will not address any claim grounded in a failure to promote here.

**B.    October 2008 Performance Review**

Melton also claims that the SSA violated Title VII insofar as it retaliated against her by "defaming" her in her October 2008 performance review. The SSA argues that judgment should be entered in its favor on this claim, because there is no record evidence to support Melton's *prima facie* case.

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). To satisfy the first element, the employee must either "participate in certain Title VII proceedings (the

---

[6]Indeed, as noted above, the SSA did not address any claim involving a failure to promote in its investigation of Melton's complaint, and the EEOC refused to address any such claims on appeal, stating that such claims were not properly before it.

'participation clause') [or] oppose discrimination made unlawful under Title VII (the 'opposition clause')." Id. at 341 (citing Slagle v. Cnty. of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)).  To satisfy the second element, a plaintiff "must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) ("Burlington Northern").  To satisfy the third element, "a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and [the materially adverse action]." Id. at 341-42.

The SSA concedes that Melton's testimony at the Hoggard hearing satisfies the first element of her Title VII retaliation claim.  However, the SSA maintains that Melton cannot prove either that the October 2008 performance review -- or any aspect of it -- constituted materially adverse action or that there is a causal connection between the performance review and Melton's EEO testimony.

### 1.    Adverse Action

In the retaliation context, an adverse employment action is any action that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Moore, 461 F.3d at 341 (quoting Burlington Northern, 548 U.S. at 68).  Put another way, an adverse employment action is an action that is "likely to dissuade employees from complaining or assisting in complaints about discrimination."  Burlington Northern, 548 U.S. at 70.  The United States Court of Appeals for the Third Circuit emphasizes that in evaluating whether an action is materially adverse, "'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'"  Moore, 461 F.3d at

346 (quoting <u>Burlington Northern</u>, 548 U.S. at 68) (alteration in original), and citing <u>Jensen v. Potter</u>

435 F.3d 444, 451 (3d Cir. 2006) ("[Title VII] does not mandate a happy workplace.")).

Accordingly, although minor events, such as "complaints of 'increased scrutiny' and 'reprimands

about plaintiff's lateness' would not, under most circumstances, rise to the level of materially

adverse actions, courts have recognized that [more significant events, such as] the imposition of

disproportionately heavy discipline would satisfy the . . . standard." <u>Harley v. Geithner</u>, Civ. A. No.

07-3559, 2010 WL 3906642, at *14 (D.N.J. Sept. 29, 2010) (quoting <u>Flynn v. New York State Div.</u>

<u>of Parole</u>, 620 F. Supp. 2d 463, 490 (S.D.N.Y. 2009), and citing <u>Moore</u>, 461 F.3d at 346).

      In the instant case, Melton complains that her October 2008 performance review included

the following comment:  "You treat the public with courtesy and respect and maintain a positive and

productive relationship with your claimants.  You need to consistently display the same skills when

dealing with your fellow employees and members of management, pa[r]ticularly when you are in a

stressful situation."  (Ex. 17 to Def.'s Summ. Judg. Mot.)   Significantly, she concedes that her

October 2008 performance review, which reflects a successful contribution to the agency and

includes several positive comments, was "uniformly positive" (Melton Dep. at 321), but she

nevertheless maintains that the single comment in the review was "defamatory."  She appears to

contend both that the comment itself constituted an adverse action and that the comment so infected

the otherwise positive review that it rendered the entire review adverse as well.

      We find that, as a matter of law, neither the comment about which Melton complains nor the

review in which it appears can be characterized as "materially adverse."   Indeed, we have no

hesitation concluding that no reasonable fact-finder could find that the single, isolated comment,

which is not even wholly negative, would dissuade a reasonable employee from complaining about

unlawful conduct.  Moore, 461 F.3d at 341; see also Ponton v. AFSCME, AFL-CIO, 395 F. App'x

867, at *4 (3d Cir. 2010) (finding that evaluation that rated employee as "satisfactory" was not

materially adverse even though it also included comment that employee occasionally refused to

follow directives).  Rather, we hold that a reasonable factfinder could only conclude that the

comment falls within the category of  "'petty slights or minor annoyances that often take place at

work and that all employees experience.'"  Id. at 346 (quoting Burlington Northern, 548 U.S. at 68).

　　　　Moreover, we observe with respect to the review as a whole that "positive reviews that have

no effect on salary or promotion are not an adversity of any sort that is actionable under Title VII."

Harley, 2010 WL 3906642, at *16.  Melton baldly states in her declaration that the October 2008

"comment and rating cost [her] promotions and a monetary reward" (Melton Decl. ¶ 13), but there

is simply no evidence to support this assertion in the summary judgment record.  See Kirleis v.

Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009) ("[C]onclusory, self-serving

affidavits are insufficient to withstand a motion for summary judgment.");  Lujan v. Nat'l Wildlife

Fed'n, 497 U.S. 871, 888 (1990) (explaining that a plaintiff may not defeat a properly supported

summary judgment motion by substituting the "conclusory allegations of the complaint . . . with

conclusory allegations of an affidavit").  Indeed, neither the Complaint nor Melton's summary

judgment brief mention any promotions that Melton applied for and was denied after September of

2008, much less any monetary rewards that she was denied.  (See Compl. ¶ 16 (alleging only that

Melton applied for and was denied promotions between July 2007 and September 2008);  Pl's Mem.

of Law in Opp. to Summ. Judg. Mot. at 21-22 (complaining about rejection notices that Melton

received on September 20, 2007 and September 30, 2008); see also Melton Decl. ¶ 14 (referencing

denial of promotion on September 30, 2008).)  Moreover, our own review of the summary judgment

record has uncovered no evidence regarding promotions that Melton was denied after September of 2008.

Accordingly, we conclude, as a matter of law, that neither the comment nor the performance review as a whole constituted "adverse action" that could give rise to a cognizable Title VII retaliation claim, and no reasonable factfinder could conclude otherwise on the record presented.

### 2.    Causal Connection

We also conclude that there is no record evidence to support a conclusion that there was a causal connection between Melton's Hoggard testimony and the October 2008 review.  We examine "the record as a whole" to determine if there is a causal connection between protected activity and employment action.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).  There are "two primary ways to substantiate" the requisite causal connection: "showing that the temporal proximity between the two is 'unusually suggestive,' or pointing to an 'ongoing antagonism' between the plaintiff and defendant."  Gladysiewski v. Allegheny Energy, No. 09-4680, 2010 WL 3622446, at *2 (3d Cir. Sept. 20, 2010) (quoting Farrell, 206 F.3d at 280-81).  Thus, "where 'the temporal proximity is not so close as to be unduly suggestive,'" the Third Circuit has "recognized that 'timing plus other evidence may be an appropriate test . . . .'"  Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 513 (3d Cir. 2003)).

Here, the time between Melton's Hoggard testimony and the October 2008 performance evaluation was thirteen months, which is not close enough in time to be unusually suggestive of a causal connection.  See Thomas, 351 F.3d at 114 (stating that timing was not unusually suggestive where over three weeks passed between complaint and termination letter); Andreoli v. Gates, 482

F.3d 641, 650 (3d Cir. 2007) (finding that five-month time period between employee's informal

complaint and first alleged adverse action, without additional evidence, was insufficient to infer

casual connection in Title VII retaliation case); Warenecki v. City of Philadelphia, Civ. A. No. 10-

1450,  2010 WL 4344558, at *11 (E.D. Pa. Nov. 3, 2010) ("Generally, a period of several months

between the protected activity and the adverse employment action is insufficient to create a causal

inference." (citing cases)); Wooler v. Citizens Bank, Civ. A. No. 06-1439, 2006 WL 3484375, *7

(E.D. Pa. Nov 30, 2006) (holding that gap of approximately four months between plaintiff's

protected activity and termination was not "unusually suggestive"), aff'd, 274 F. App'x 177 (3d Cir.

2008).

Moreover, there is no other evidence in the record from which Melton could satisfy her

burden of showing that the review was causally connected to her Hoggard testimony a full thirteen

months before.[7]  Even Melton concedes that she "do[es] not have any written statement or direct

statements made to [her] regarding a link between [her] testimony and the Hoggard hearing and [her]

final 2008 [performance] appraisal."  (Melton Decl. ¶ 20.)  Furthermore, when pressed at oral

argument to identify record evidence in support of a causal connection, Melton's counsel was unable

to do so.  (See 8/2/12 Tr. at 40-44; see also id. at 44 (reflecting that Plaintiff's counsel points to

Melton's entirely speculative testimony that the negative comment "could have been because they

knew [about the Hoggard EEOC proceeding]").)

Under all of these circumstances, we conclude that the record evidence, viewed in the light

most favorable to Melton, does not support a conclusion that Melton's October 2008 performance

---

[7]Of course, if we accept Melton's assertion that the SSA first became aware of her intent to
testify at the Hoggard hearing on June 25, 2007, see supra n.5, she received the October 2008
performance review a full sixteen months after the protected conduct.

review either constituted "materially adverse action" or was causally connected to Melton's testimony at the Hoggard hearing.  We therefore grant the SSA's motion for summary judgment insofar as it seeks judgment in its favor on Melton's retaliation claim grounded on the October 2008 performance review.

### C.    Retaliation Based on an Hostile Work Environment

Melton also argues that a number of workplace incidents, when considered together, are sufficient to establish retaliation predicated upon a hostile work environment.  Specifically, she asserts that she has submitted record evidence of the following incidents, which together created a retaliatory hostile work environment:

(1)    In October, 2007, Tonik threatened Melton with an AWOL charge if she did not submit documentation in support of her request for extended medical leave.

(2)    Tonik accused Melton of returning late from her morning break on April 16, 2008.

(3)    On at least one occasion, in January 2008, when Melton was out of the office for the day, management went through the papers on her desk and left the desk in disarray.[8]

(4)    In February 2008, SSA management refused to investigate Melton's complaint that a stranger had applied for and received her father's social security benefits.[9]

---

[8]Melton's Statement of Claims states more generally that "Melton would come back to the office from being out a day, to find that her desk in disarray.  Co-others [sic] would inform her that management was at her desk." (Pl.'s Stmt of Claims ¶ 4(g).)  However, the evidence of such conduct that Melton cites in her Post-Hearing Submission concerns only one such occurrence, in January 2008.  (See Pl.'s Post-Hrg Submission at ¶ 4g.)  Accordingly, that is the only such incident that we consider in assessing her hostile work environment claim.

[9]The SSA argues that Melton cannot rely on the SSA's alleged mishandling of her father's social security benefits to support her retaliatory hostile work environment claim, because she did not mention this mishandling in her EEO charge of discrimination.  However, caselaw suggests that a plaintiff may assert new allegations of harassment, not included in her administrative complaint, as long as the new allegations merely buttress a hostile work environment claim that she previously raised with the EEOC.  Brooks v. CBS Radio, Inc., Civ. A. No. 07-0519, 2007 WL 4454312, at *8 (E.D. Pa. Dec. 17, 2007) (citing King v. M.R. Brown, Inc., 911 F. Supp. 161 (E.D. Pa. 1995), and

(Pl.'s Stmt of Claims at ¶ 4(d), (e), (g), (i).)[10]  The SSA responds to this retaliatory hostile work

environment claim with several different arguments, including that the alleged incidents, even when

viewed collectively, cannot be characterized as "materially adverse," and that there is no evidence

on which to base a reasonable conclusion that the incidents were the result of any retaliatory

animus.[11]

_____

Ziner v. Cedar Crest Coll., Civ. A. No. 04-3491, 2006 WL 1517387, at *3 (E.D. Pa. May 30, 2006)).
Accordingly, we will not prohibit Melton from relying on this incident solely because she failed to
raise it at the administrative level.

   [10]In her Statement of Claims, Plaintiff asserted that four additional incidents were evidence
of a hostile work environment: (1) Melton's bible and other documents were allegedly discarded,
(2) Melton's personal belongings were removed from her desk drawers and placed on top of her
desk, (3) Melton asked Tonik where her office was, and Tonik replied "Far away from you"; and (4)
Tonik assigned Melton a "high volume of case load," and did not give her the freedom to manage
her work that she gave to other claims representatives.  (See Pl.'s Stmt of Claims ¶¶ 4 (b), (c), (f) and
(h).)  However, Melton conceded at the August argument that the first two of these incidents
occurred prior to her protected conduct and, thus, she withdrew them as bases for her hostile work
environment claim.  (See 8/2/12 Tr., at 28-29, 34; see also Pl.'s Post-Hrg Submission at 12.)
   In addition, the record reflects that the latter two incidents also predated Melton's protected
conduct.  The third incident occurred when Melton returned from the PREDP program on June 18,
2007, over three months before Melton testified at the Hoggard hearing, and even before Melton was
advised that she would be a witness at that hearing.  (See Tonik Dep. at 39-41; Melton Dep. at 108-
109; Def. Stmt ¶ 9; Ex. 7 to Def.'s Summ. Judg. Mot. (reflecting that Melton learned on June 25,
2007 that she would be a witness at the  Hoggard hearing).)  Likewise, the evidence that Melton
identifies as establishing the fourth incident makes clear that the alleged inequities in Melton's
workload, predated her protected conduct. (See Post-Hrg Submission (citing, e.g., Melton Dep. at
98-102 (stating that Tonik started treated Melton differently in 2005); id. at 442-49 (stating that
Tonik assigned her a full workload the same day she returned from PREDP, i.e., June 18, 2007)).)
Thus, we concluded that all four incidents predated Melton's protected conduct and cannot provide
a factual basis for her retaliation claim grounded in a hostile work environment.

   [11]The SSA also argues that Melton failed to exhaust her hostile work environment claim,
because she failed to raise it in her EEO proceedings.  Contrary to the SSA's assertion, Melton did
raise the claim in those proceedings.  When Melton initially filed her EEO charge, the SSA
investigated a "claim that based on reprisal, management subjected [Melton] to continuous
harassment (non-sexual) and a hostile work environment beginning in 2007 to the present." (Ex. G
to Partial SJ Mot.).  In addition, on appeal, the EEOC considered the retaliatory hostile work
environment claim and concluded that Melton had failed to establish that events, taken as a whole,

In Hare v. Potter, 220 F. App'x 120 (3d Cir. 2007), the Third Circuit opined that retaliation claims predicated on a hostile work environment are cognizable under Title VII where a collection of incidents in the workplace, considered together as an "'overall scenario,'" both satisfy the requirement of "materially adverse" conduct and are also proven to be driven by a retaliatory animus.[12] Id. at 132 (citing and quoting Jensen, 435 F.3d at 448, 450, overruled in part by Burlington Northern, 548 U.S. 53; and citing Moore, 461 F.3d at 341)).  Thus, the Third Circuit stated, where "an employee who had excelled in previous assignments and who had good working relationships with her supervisors encounter[ed] so many problems just after she told her supervisor that she had engaged in protected conduct[,] . . . it would not be unreasonable for a jury to conclude that [the employer] treated [the employee] more severely than he otherwise would have because of her [protected conduct]."  Id. at 132-33.

Here, the record evidence, viewed in the light most favorable to Melton, does not support a conclusion that the environment about which Melton complains was either materially adverse or the result of retaliatory animus.  First, we find that the conduct about which Melton complains,

---

were sufficient severe or pervasive enough to establish a *prima facie* case of retaliatory harassment. (Ex. J to Partial SJ Mot.)  Accordingly, we conclude that Melton exhausted her retaliation claim grounded in a hostile work environment.

[12]The SSA urges us to reject the standard set forth in Hare, and to instead follow the guidance of the Third Circuit in another recent decision, Harley v. Secretary of the Treasury, 444 F. App'x 594 (3d Cir. 2011).  As the SSA notes, Harley cautioned against permitting plaintiffs to "'morph' hostile work environment and retaliation causes of action into one," and reiterated that the usual standard for hostile work environment claims is that "the conduct complained of must be adverse, severe, pervasive, or regular and of the kind that would have detrimentally affected a reasonable person in like circumstances."  Id. at 596 (citation omitted).  However, we are not convinced that Harley requires the rejection of the analysis in Hare, which directly addressed the issue before us now, i.e., the precise standard by which we should judge a retaliation claim predicated on hostile work environment.  Accordingly, we will apply Hare.

considered as a whole, is nothing more than a random collection of "petty slights [and] minor annoyances that often take place at work and that all employees experience." <u>Moore</u>, 461 F.3d at 346 (quotation omitted).  Put simply, Melton is merely complaining that, over a six-month period, she was scolded once for returning late from a break; another employee rifled through her desk papers; she was required, in accordance with SSA policy, to submit precise documentation to support her request for extended sick leave; and she was refused special treatment when addressing an issue concerning her father's social security benefits.  No reasonable jury could possibly conclude that this conduct, even when considered collectively, "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  <u>Id.</u> (quoting <u>Burlington Northern</u>, 548 U.S. at 68).

Likewise, there is no record evidence from which a reasonable jury could conclude that the SSA's conduct towards Melton after it learned of her intended testimony at the Hoggard hearing was motivated by a retaliatory animus, because the summary judgment record simply contains no evidence of such retaliatory animus.  First, unlike the situation in <u>Hare</u>, there is no evidence in this case of any statements from Tonik or any other supervisor that would indicate anger about, or disappointment with, Melton's testimony at the Hoggard hearing.  <u>See Hare</u>, 220 F. App'x at 132 (finding evidence of a retaliatory animus in manager's statement, upon learning that employee had complained to the EEOC regarding discrimination, that he "disapproved of it" and that she "'was ending her career'" by pursuing it); <u>see also Jensen</u>, 435 F.3d at 450 (finding evidence of retaliatory animus in co-worker's statement that plaintiff was "'the [obscenity] who got [the supervisor] in trouble'" (first alteration in original)).

Furthermore, the record reflects no change in the SSA's attitudes or conduct towards Melton

following her protected conduct, such that a factfinder could infer a causal connection between
Melton's EEO testimony and the work environment.  Indeed, contrary to Melton's assertion that the
work environment changed after the SSA learned that she would be testifying before the EEOC, the
record clearly shows that both before and after the SSA allegedly learned of her intention to testify,
Melton complained about supposed mistreatment at the hands of her SSA supervisors.  As Melton
concedes, prior to June 2006, she was "upset by numerous perceived slights and instances in which
she believed that she was being treated unfairly by her supervisors in the Northeast Office." (Def.
Stmt ¶ 132).  More specifically, Melton complained that the SSA denied her promotions starting in
2004 (Melton Decl. ¶ 41), and testified at her deposition that the SSA distributed work unfairly
starting in 2004 and 2005, giving her "double the work" of everyone else.  (Melton Dep. at 30.)  She
also complained that, in 2005, Mannion threatened to take away her opportunities for overtime if she
refused a request he made to close the office for him.  (Id. at 104-06.)

        With respect to Tonik in particular, Melton stated in December 2008 that "Ms. Tonik has a
long history of saying and doing disturbing things which interfere with my work environment," and
elaborated that she and Tonik had "gone 'tit for tat' for several years."  (Ex. A to Partial SJ Mot. at
3 (emphases added).)  According to Melton, in 2005 and 2006, Tonik also unreasonably failed to
make her a mentor to new claims representatives, telling her that she "talk[ed] too much." (Melton
Dep. at 90-91.)   Melton further asserted that, in 2005, Tonik accused her of "not clearing as much
as the other people" and, in return, Melton accused Tonik of doing other people's work for them,
while refusing to help Melton with her work.  (Id. at 100-01).  On this record, we find that no
reasonable jury could conclude that any minor mistreatment between November 2007 and April
2008, was retaliatory for her Hoggard testimony, rather than simply consistent with Melton's prior

working experience.  Accordingly, we conclude that Melton has failed to meet her summary judgment burden of establishing a *prima facie* case of retaliation predicated on a hostile work environment, and we grant judgment in the SSA's favor on that claim.

**IV.     CONCLUSION**

For the foregoing reasons, we grant Defendant's Motion for Summary Judgment in full.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.